UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                         :

MITCHELL LOW,                       :
                                         :
                  Plaintiff,    :
                                         :
              -against-        :
                                       :
GEORGE E. ROBB, JR.,         :
                                       :
                  Defendant.  :
                                       :
-----------------------------------------------------------X

11-CV-2321 (JPO)

MEMORANDUM
OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/20/12

J. PAUL OETKEN, District Judge:

      Plaintiff Mitchell Low ("Low") filed this action against Defendant George E. Robb, Jr. ("Robb") for fraud, unjust enrichment, breach of fiduciary duty, accounting and anticipatory breach of contract.

      Robb moves to dismiss the claim for fraud under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules"), for failure to state a claim upon which relief can be granted. Robb also moves to strike certain allegations in the Complaint under Rule 12(f) of the Federal Rules, on the ground that those allegations are inappropriate, irrelevant, and scandalous. For the reasons that follow, Robb's motion to dismiss the claim for fraud is granted, and Robb's motion to strike is granted in part and denied in part.

## I.    Background

### A. Factual Background

      The following facts are drawn from the allegations in the Complaint, which are presumed true for the purpose of this motion. The case arises out of a dispute between former friends and business partners over the proceeds of the ventures of that business. The complaint contains

extensive detail about the parties' relationship and business dealings.  The facts set forth below are those that are relevant to resolution of these motions.

**Parties**

Plaintiff, Low, is a citizen of New York.  He has been a licensed real estate broker for over thirty years.  Defendant, Robb, a citizen of Florida at the time the Complaint was filed, ran his family's business, Robb Peck McCooey Financial Services, Inc. ("RPM"), a Wall Street specialist firm.

**Low Joins RPM**

In the mid-1990's, Low joined RPM's real estate subsidiary, RPM Real Estate Management Corporation, and eventually became its president.

During his time working for RPM, Low also held certain real estate interests independently.  In 1995, Low came to own two residential buildings in New York, New York: 35 Vestry Street and 140 East 13th Street.  At that time, the properties had a combined market value of approximately $3.9 million and Low had an equity interest in the properties of approximately $1.9 million.  Low brought to RPM the opportunity to buy the equity in these buildings.  Low expressed his desire to receive additional compensation for the properties above his customary compensation of a percentage of the profits for developing the properties for sale by RPM, because he was also giving up his own equity interest in the properties.

Robb agreed that in exchange for Low's contribution of his equity interest in the 35 Vestry Street and 140 East 13th Street properties, RPM would compensate Low with a 1.5% interest in RPM if and when RPM was sold to outside investors.  At that time, RPM was valued at $120 million, giving Low an equity interest equal to $1.8 million.

2

During this same time period, Low also brought another real estate opportunity to RPM: a warehouse located at 124 East 13th Street, which Low believed could be converted to a residential building.  Low negotiated the sale and personally guaranteed the mortgage, and RPM contributed capital in order to obtain the building in RPM's name.

In July 1997, Low and Robb jointly purchased the property at 140 East 13th Street from RPM for each of them to live in.  Each had the exclusive right to occupy certain portions of the building.

**RPM Acquisition**

In August 2000, LaBranche & Co. ("LaBranche") expressed interest in purchasing RPM. At that time, Robb informed Low that he could not afford to give Low his 1.5% of the proceeds of the deal at that time, and that he wanted Low to finish the development and sale of the properties at 35 Vestry Street and 124 East 13th Street.  Accordingly, the parties "decided to amend their prior agreement."  (Complaint ("Comp.") ¶ 35.)  "Under their new agreement, Low would still receive 1.5% of the proceeds of the sale of RPM, but he would not receive his money until after the properties located at 35 Vestry Street and 124 East 13th [Street] were developed and sold."  (*Id.*)

In January 2001, Low received a draft proposed merger agreement between RPM and LaBranche and noticed that the document did not acknowledge his 1.5% interest in RPM. Robert Murphy, then-president of RPM, confirmed the amended agreement orally and assured Low that it would be recorded in writing.

As part of the sale of RPM, Low and Robb decided to form REMCO LLC ("REMCO") to hold the real estate assets of RPM, which were not being acquired by LaBranche.  Murphy

informed Low that his 1.5% interest in RPM would be recorded in the LLC agreements for REMCO.

Prior to the close of the LaBranche deal, Nathan Mistretta, then-Vice President, Secretary, and Treasurer of RPM, informed Low that Robb wished to take three properties out of the pool of RPM properties and put them in Robb's own limited liability company rather than transfer them to REMCO. Low was told that he would receive a $750,000 cash bonus at the close of the LaBranche merger as compensation for these properties. He was also told that this cash bonus would not affect his brokerage commission.

On January 18, 2001, the merger agreement between RPM and LaBranche was finalized. On January 22, 2001, Low received from Murphy a document that embodied the agreement to pay Low his 1.5% interest in RPM as a brokerage commission.[1] On March 7, 2001, REMCO was formed. Although the LLC agreement did not contain any reference to Low's right to a brokerage commission equal to his 1.5% interest in RPM, "Low was not concerned since the parties had agreed that the money would be paid as a brokerage commission and Murphy had separately detailed the parties' agreement in writing." (Comp. ¶ 45.) The merger closed on March 15, 2001. At that time, Low's 1.5% interest was worth $5,418,510. Low was paid only $278,000 of the promised $750,000 bonus.

### Amended REMCO LLC Agreement

After the merger, Murphy contributed to REMCO a multi-unit development property (referred to as "Clove Hill").

In August 2001, Low, Murphy, and Robb met to discuss REMCO. At the meeting, Robb again confirmed Low's right to a brokerage commission equal to his 1.5% equity interest in

---

[1] That document also contained an "Adjusted New Offer," offering Low an alternative payment calculated using a 1.0% equity interest. Low refused to sign the Adjusted New Offer.

4

RPM and confirmed that Low did not receive his full $750,000 bonus at the closing of the merger. It was further agreed that Murphy would be formally admitted as a member of REMCO, and that Low would receive 15% of the proceeds from the development and sale of Clove Hill.

On June 7, 2002, Low, Robb, and Murphy entered into a Third Amended and Restated Limited Liability Company agreement of REMCO. In addition to the promises made at the August 2001 meeting, the agreement also stated that Low was entitled to (1) a one-time $300,000 management fee; (2) a $150,000 forgivable loan; (3) 50% of the profits from the sale of the 35 Vestry Street and 124 East 13th Street properties; (4) 15% of the profits from the development of Clove Hill; and (5) quarterly distributions for two years totaling $200,000. (Comp. ¶ 49.) Only the $200,000 was to be counted as an offset of any distributions to which Low was otherwise entitled. The $300,000 was designed to be a partial payment of the remainder of the $750,000 bonus that Robb owed Low.

### Robb and Family Occupy REMCO Properties

Until 2001, the parties were both living in apartments in the 140 East 13th Street property. In 2001, Robb and his wife, Veronica Webb, wanted to move into the penthouse at 124 East 13th Street. Because that property was not ready to be lived in, they moved instead into the penthouse in 35 Vestry Street. Robb then "turned over" renovation of that penthouse to Webb "over the objection of Low." (Comp. ¶ 51.) Webb converted the five-bedroom penthouse into a three-bedroom penthouse and installed various custom fixtures and upgrades. In the meantime, Robb and Webb also began to renovate the penthouse at 124 East 13th Street. These renovations involved "many mistakes" and improperly installed fixtures. (Comp. ¶ 55.)

Low's understanding of the arrangement was that Robb and Webb would occupy 35 Vestry Street for a short time while they finished renovating 124 East 13th Street in preparation

for their purchase of it. Low had opportunities to rent the penthouses in both buildings that he was forced to turn down because they were being occupied and renovated by Low and Webb. For example, a professional athlete was willing to rent the 35 Vestry Street penthouse for $30,000 per month at the time Robb and Webb moved in. (Comp. ¶ 52.) And a "famous actor" offered to rent the penthouse at 124 East 13th Street for $360,000 per year for two years. (Comp. ¶ 57.)

At some point thereafter (the Complaint is not clear), Robb and Webb divorced. As of the date of the filing of the Complaint, Robb was living (apparently part-time) in the renovated penthouse in 124 East 13th Street, Webb was living in the penthouse in 35 Vestry Street, and Robb's daughter was living in another unit in 124 East 13th Street. Neither Robb nor anyone in his family has ever paid any rent to REMCO for occupying the properties.

### Robb Attempts to "Get Rid of Low"

In October 2009, Robb sent Low a report purporting to show Low's projected profits on the sale of the REMCO properties at 35 Vestry Street, and 124 and 140 East 13th Street. The report was prepared at Robb's request by John Cirigliano, a financial expert. The report significantly undervalued Low's projected profits by using below-market values for the properties, and by inaccurately stating REMCO's expenses in developing the properties (principally by including the money that Robb and Webb had spent renovating the properties for their own use). The report also counted payments that Low received from REMCO as pre-payments against his equity interest. Finally, the report repudiated Low's right to the brokerage commission upon the sale of the properties.

Low responded to this report by informing Cirigliano that he wished to purchase the properties himself at the stated value. Cirigliano informed Low that the report was not meant to

be an offer, but was simply an explanation of what Low was entitled to. Some time after that, Low received a voicemail message from Cirigliano asking when he and Robb could expect to hear back from Low regarding the report. Then, apparently not realizing that he had failed to hang up the phone, Cirigliano said "Mitch the bitch. I can't wait to [expletive] the bitch." (Comp. ¶ 65.)

On April 20, 2010, Robb and Cirigliano sent a second valuation report to Low. This report contained the same inaccuracies as the first one, but increased the value of the properties themselves by $1.5 million. Low discussed the report with Robb, who said, "I will force you to come up with a number and sit down with me and give up these properties." (Comp. ¶ 67.)

On June 30, 2010, Low received another valuation report, which used the same market values as the April report, but purported to show that Low's interest was worth $350,000 less than what was stated in the April report. Low refused to respond to this report.

Low approached Robb in January 2011 hoping to resolve the dispute without resort to litigation. At the meeting, Low demanded the money that was owed to him, including the brokerage commission, money for the REMCO properties, and money owed to him for Clove Hill. Robb "made it clear that he was not planning to give Low anything that was owed to him." (Comp. ¶ 72.)[2]

**B. Procedural History**

The Complaint in this action was filed on April 5, 2011. The case was initially assigned to the Honorable Laura Taylor Swain, U.S. District Judge. Robb first filed his motions to dismiss and strike on June 3, 2011. However, the motion was terminated without prejudice by

---

[2] The Complaint also details a dispute between Robb and Murphy regarding alleged diversions of REMCO funds by Murphy. A detailed exploration of this dispute is not necessary to the resolution of the instant motions.

Judge Swain for failure to comply with her Individual Practice Rules, which provide that prior to making a motion of any type, the parties "shall use their best efforts to resolve informally the matters in controversy." (Order at 1, June 6, 2011 (Dkt. No. 12).)

On July 8, 2011, Low filed an application for reinstatement of the motions, and provided documentation of the parties' unsuccessful efforts to resolve the disputes. (Dkt. No. 14.) Thereafter, on September 28, 2011, Judge Swain reinstated the motions and provided a briefing schedule for responses to the motion. (Dkt. No. 17.)

On October 14, 2011, the case was reassigned to the undersigned pursuant to this District's Rules for the Division of Business Among District Judges governing the reassignment of cases to new district judges.

## II.     Discussion

### A. Motion to Dismiss

Robb moves to dismiss the fraud claim as duplicative of Low's contract claim, and therefore barred under New York law.

### 1. Motion to Dismiss Standard

In order to survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, ---, 129 S.Ct. 1937, 1949 (2009). Where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570. The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw [ ] all

inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotation marks omitted).  On the other hand, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949; *see also Twombly*, 550 U.S. at 555 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

## 2. Applicable Law

Under New York law, to prove a fraud claim, a plaintiff must show that "(i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result of such reliance." *Maxim Group LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 306-07 (S.D.N.Y. 2010).  A plaintiff may not maintain a fraud claim that is merely a restated claim for a breach of contract.  *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir. 1995) ("A cause of action for fraud does not lie where the plaintiff alleges only that defendant entered into a contract with no intention of performing.").  "In other words, a cause of action for fraud in inducing a contract cannot be based solely upon a failure to perform contractual promises of future acts.  An alleged failure to perform such acts is a breach of contract which must be enforced by an action on the contract." *Hudson Optical Corp. v. Cabot Safety Corp.* 971 F. Supp. 108, 109 (E.D.N.Y. 1997) (quoting *C.B. Western Financial Corp. v. Computer Consoles, Inc.*, 122 A.D.2d 10, 504 N.Y.S.2d 179, 182 (N.Y. App. Div. 2d Dep't 1986)) (quotation marks omitted); *see also Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) ("[W]here a fraud claim arises out of the same facts as plaintiff's breach

of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." ).

A plaintiff may bring a claim for fraud alongside a claim for breach of contract in certain situations based on a theory that the defendant's false promises constituted fraudulent inducement to enter into the contract. *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986). New York courts have held that "a promise made with a preconceived and undisclosed intention of not performing it[] constitutes a misrepresentation" that could support a fraud claim, where the statement of promissory intent is "a representation of present fact, not of future intent . . . ." *Id.* The New York Court of Appeals has also stated that "[a] false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122 (1995) (citations omitted) (holding that allegation that defendant law firm partner represented that he would "act to ensure the future of the firm by integrating and institutionalizing the clients when he never intended to do so and indeed was considering the formation of a new partnership" could support an action for fraud).

While these decisions would seem to contradict the broader rule that a fraud claim cannot be pleaded based on a failure to fulfill contractual promises, courts have reconciled the two principles by requiring an additional showing in order to maintain the fraud action. As the Second Circuit has explained, a fraud claim based on contractual promises can survive if the plaintiff "(i) demonstrate[s] a legal duty separate from the duty to perform under the contract; or (ii) demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) [is] seek[ing] special damages that are caused by the misrepresentation and unrecoverable as

10

contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (internal citations omitted).  The purpose of this additional burden is to "ensure[] that contract actions are not improperly converted into fraud actions by mere allegations that a contracting party did not intend to meet its contractual obligations." *Osan Ltd. v. Accenture LLP*, 454 F. Supp. 2d 46, 52 (E.D.N.Y. 2006) (citation omitted).

Courts in this circuit have explained that "[f]or a fraudulent misrepresentation to be collateral or extraneous to a contract, it must be a promise to do something other than what is expressly required by the contract." *W.B. David & Co., Inc. v. DWA Communications, Inc.*, No. 02 Civ. 8479, 2004 WL 369147, at *5 (S.D.N.Y. Feb. 26, 2004); *see also Grappo*, 56 F.3d at 434 ("A fraud action is permitted, however, where the plaintiff alleges that the defendant engaged in other fraudulent conduct besides entering the contract with no intention to perform.").

### 3. Application of Law to Facts

In the Complaint, Low alleges that "Robb Jr. represented that Low would receive 50% of the profits from the sale of the properties located at 35 Vestry St[reet] and 124 East 13th St[reet]; his 1.5% equity interest from the sale of RPM, as a brokerage commission at the time of the sale of these properties; and 15% of the profits from Clove Hill." (Comp. ¶ 74.)  He further alleges that these representations were "either knowingly false when made or made with reckless disregard for the truth because Robb Jr. intended to keep these properties, commission and profits for himself," and were "made for the purpose of inducing, and did induce, Low to enter into agreements and delay the receipt of consideration owed to him." (Comp. ¶¶ 75-76.)  Low alleges that, in reliance on the material misstatements, he "allowed Robb Jr. to occupy the properties, delay [Low's] ability to sell the properties, delay the payment of [Low's] merger

11

consideration and allow Robb Jr. to control distribution of [Low's] profits from [the sale of] Clove Hill." (Comp. ¶ 77.)

Robb argues that Low's claim for fraud must be dismissed because it "rests on the same alleged failure to perform that gives rise to his cause of action for anticipatory breach of the alleged contract." (Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's First Cause of Action for Fraud, Pursuant to FRCP 12(b)(6), and to Strike Various Allegations in the Complaint, Pursuant to FRCP 12(f) (Dkt. No. 10) ("Def. Mem.") at 1.)  Low responds that his fraud claim passes the *Bridgestone* test, because (1) Robb owed Low a fiduciary duty as a partner in REMCO independent of the contract; (2) Robb made misrepresentations that were collateral or extraneous to the contract; and (3) Low suffered special damages as a result of Robb's fraud.  Specifically, Low argues that the following separate allegations of fraudulent conduct on the part of Robb support his fraud claim:

> (i) Fraudulently inducing Low to forego his $5.4 million payment by making a knowingly false promise to Low to pay that amount as a brokerage commission once the REMCO properties were sold; (ii) representing to Low that he would receive 50% of the profits from the sale of certain REMCO properties and 15% from the sale of others; (iii) preventing the sale of the REMCO properties to avoid triggering Defendant's obligation to pay Low his share of the profits from the REMCO properties and his brokerage commission of $5.4 million; and (iv) providing Low with false valuation reports for the REMCO properties, with false expenses and deductions in value, in an attempt to shortchange Low of his rightful share of the profits.

(Plaintiff's Opposition to Defendant's Motion to Dismiss Plaintiff's First Cause of Action for Fraud and to Strike Various Allegations in the Complaint (Dkt. No. 21) ("Pl. Opp.") at 1.)

Most of the specific examples of fraudulent conduct that Low highlights would be insufficient to support an independent claim for fraud under these circumstances.  For example, Robb's alleged prevention of the sale of the REMCO properties (by having members of his family reside in the various buildings) did not involve any material misrepresentations of fact.

The valuation reports allegedly did include misrepresentations of fact, but Plaintiff does not allege that he relied on the representations contained therein. In fact, he expressly alleges that he "refused to respond to the [final] valuation report." (Comp. ¶ 68.)

Finally, Robb's alleged fraudulent inducement of Low's foregoing his $5.4 million payment by promising to pay that money as a brokerage commission upon the sale of the properties overlaps in full with the claim for anticipatory breach of contract. The Complaint characterizes this contract as providing that "Low [was required to] develop and sell the properties . . . ," and "Robb [was required] to pay him a brokerage commission representing his 1.5% interest in the proceeds of the sale of RPM to LaBranche upon the sale of those properties." (Comp. ¶ 98.) Low may not also maintain an action for fraud for failing to perform the obligations under the very contract he is suing to enforce.

More difficult is Robb's statement that Low would receive 50% of the profits from the sale of 35 Vestry Street and 124 East 13th Street and 15% of the proceeds of the development of Clove Hill. On the one hand, these statements appear to be "collateral or extraneous" to the original contract entitling Low to a 1.5% interest in the sale of RPM as a brokerage commission upon the sale of those properties. *Bridgestone/Firestone*, 98 F.3d at 20. The problem is that these "statements" were not misrepresentations of fact that induced Low to enter into the original contract. Rather, they were the promises contained in a separate – albeit related – contract, entered into *after* the original contract.[3] The Complaint expressly alleged that these "statements"

---

[3] In fact, in the Complaint, Low initially characterizes the two different contracts as being all part of one "agreement":

> *The agreement* of the two best friends was clear. The partners would share equally in the profits from the sale of two exclusive New York City properties, and Low would receive his proceeds from the LaBranche acquisition of RPM as a brokerage commission after all of the units in the two properties were sold.

13

were embodied in the Third Amended and Restated Limited Liability Company agreement of REMCO LLC. (Comp. ¶ 49.)  When viewed in this manner, it is clear that Robb's alleged "misrepresentations" were not collateral or extraneous to the contract – that is, they were not promises to "do something other than what is expressly required by the contract" – they *were* the contract. *W.B. David & Co., Inc.*, 2004 WL 369147, at *5.  Low does not allege any misstatements by Robb, on which Low relied, that were not simply promises contained in the agreements themselves.

The appropriate remedy for the alleged breach of the LLC agreement is a contract action, not a tort action for fraud. *See Hudson Optical Corp.*, 971 F. Supp. at 109.  That Low limited his claim for breach of contract to the first contract (for his 1.5% interest in RPM) does not thereby allow him to "simply dress[] up" a separate breach of contract action as an independent tort claim for fraud. *Telecom Int'l America*, 280 F.3d at 196.

Low attempts to rescue his fraud claim by arguing that, as managing member of REMCO, Robb owed Low, a member of the LLC, a fiduciary duty of loyalty. *See Melcher v. Apollo Medical Fund Management L.L.C.*, 84 A.D.3d 547, 548 (N.Y. App. Div. 1st Dep't 2011) ("[T]he manager of an LLC owes the traditional fiduciary duties of loyalty and care to the members of the LLC.").  However, the alleged misrepresentations are simply the promises contained in the very document that created this alleged duty—the amended REMCO LLC agreement.  Moreover, Low did not ground his fraud claim in an alleged breach of fiduciary duty.  In fact, although Low does bring a claim for breach of fiduciary duty, none of the conduct he alleges in connection with that claim involves any misrepresentations. (*See* Comp. ¶ 89.)

---

 (Comp. ¶ 5 (emphasis added).)  However, the more specific allegations of the Complaint make clear that the two alleged agreements were separate.

Finally, Low has not alleged any special damages that could not be redressed by a breach of contract action. While the damages from the breach of the LLC agreement are not included in Low's demand for damages for breach of contract (*see* Comp. ¶ 101 (alleging damage in the amount of $5.4 million)), all of the alleged damages could be redressed through a breach of contract action.

Thus, Robb's motion to dismiss the fraud claim is granted, without prejudice to amendment of the Complaint to restate the fraud claim as a claim for breach of the REMCO LLC agreement.

**B. Motion to Strike**

Robb moves to strike paragraphs 2, 7, 16, 17, 18, 46, and 59 from the Complaint on the ground that the allegations contained therein are irrelevant, immaterial, impertinent, scandalous, and calculated to unduly prejudice Robb. Because the Court finds that some (but not all) of the allegations contained in these paragraphs meet the standard for a motion to strike, Robb's motion is granted in part and denied in part.

**1. Applicable Law**

Pursuant to Federal Rule of Civil Procedure 12(f), a district court may, on its own or on motion of a party, strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[M]otions to strike are viewed with disfavor and infrequently granted." *In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003). As the Second Circuit has instructed, "courts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth v. United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). Nevertheless, courts in this district have held that a party may prevail on a motion to strike by showing that: "(1) no evidence in support of the allegations would be

admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Hargett v. Metropolitan Transit Authority*, 552 F. Supp. 2d 393, 404 (S.D.N.Y. 2008) (quoting *M'Baye v. World Boxing Ass'n*, No. 05 Civ. 9581, 2007 WL 844552, at *4 (S.D.N.Y. Mar. 21, 2007)); *see also G-I Holdings, Inc. v. Baron & Budd*, 238 F.Supp.2d 521, 555 (S.D.N.Y. 2002) ("In spite of this reluctance [to grant motions to strike], allegations may be stricken if they have no real bearing on the case, will likely prejudice the movant, or where they have criminal overtones.").

Courts have found allegations to be prejudicial when they are "amorphous, unspecific and cannot be defended against" and where the allegations, if publicized, "harm [the defendant] in the public eye and could influence prospective jury members." *G-I Holdings, Inc.*, 238 F. Supp. 2d at 556; *see also Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991) (striking references to defendant's prior criminal conviction and his income level because neither fact "bears remotely on the merits of th[e] case," and including them "serves no purpose except to inflame the reader").

### 2. Application of Law to Facts

The allegations that Robb moves to strike fall into two general categories: (1) disparaging statements about Robb's wealth, intellectual acumen, and moral character; and (2) allegations concerning a financial dispute between Robb and his siblings that is the subject of ongoing litigation in this Court. Robb argues that these statements are not relevant to the dispute or any question of Robb's liability, and are "simply and improperly intended to embarrass Robb and to prejudice him in the eyes of the fact-finder and, perhaps, the public." (Def. Mem. at 4-5.) He also argues that the statements referring to the ongoing lawsuit with Robb's siblings must be stricken under Second Circuit law.

16

Low argues that each of these statements is "either relevant to Low's claims, provides context or background to the action, or is simply Low's own characterization of Defendant's own actions." (Pl. Opp. at 5.) Low argues further that the statements concerning Robb's intra-family dispute are "highly relevant" to the case, because they show Robb's "pattern of conduct in breaching his promises to his close friends and family members in connection with the sale of RPM." (*Id.* at 6.)

It is well settled under Second Circuit law that allegations in a complaint "that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)." *RSM Production Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (striking paragraphs based on "complaints filed in actions that were never resolved on the merits and, thus, did not result in any findings of law or fact"); *see also Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (striking paragraphs in complaint that were "based on pleadings and settlements in other case and government investigations"); *In re Merrill Lynch*, 218 F.R.D. at 78-79 (striking paragraphs that refer to or rely on ongoing disputes, as well as SEC and NASD complaints against parties and relevant witnesses). Accordingly, notwithstanding Low's argument that these statements demonstrate a "pattern of conduct," references to unrelated disputes and lawsuits involving Robb must be stricken from the Complaint. Specifically, the following paragraphs or portions of paragraphs are stricken: Paragraph 7, only the second sentence; Paragraph 18, in full; Paragraph 46, only the clause, "Like Robb Jr.'s brothers and sisters."

The statements that are more broadly disparaging of Robb present a closer question. Paragraph 2 of the Complaint, reads as follows:

"What's mine is mine, and what's yours is mine." Perhaps no expression better describes the actions of the defendant Robb Jr. in this case. Robb Jr. was one of those lucky few people that are born into extreme wealth. So lucky in fact, that at the age of 31 Rob Jr. was given control of his family's multi-million dollar, Wall Street specialist firm Robb Peck McCooey Financial Services, Inc. ("RPM"). However, Robb Jr. is not the type of person who gives back, shares or pays forward. Instead, despite promises to many, including his dying father, brothers and sister, and best friend, Robb Jr. has used RPM and its spin-offs to make himself even wealthier simply by taking what rightfully belongs to others.

(Comp. ¶ 2.)   Paragraph 16 and 17 contain similar allegations:

16.     Robb Jr. was born into the wealthy and prestigious New York Robb family. Among other things, Robb Jr.'s grandfather helped develop RPM, a company that George Robb, Sr. ("Robb Sr.") then lead [*sic*] to become one of the leading specialist firms on the NYSE. Robb Jr. was home-schooled and had not distinguished himself in any way until 1985 when he convinced his father to give him control of RPM.

17.     In 1985, Robb Sr. became ill and could no longer run RPM, which had become an extremely profitable firm under two generations of Robb family leadership. Wanting to keep the company in the family, Robb Sr. conveyed a controlling interest in this family business to his oldest son, Robb Jr.

(Comp. ¶¶ 16-17.)

These paragraphs do provide some relevant background information. But they also contain disparaging comments on matters that are simply not pertinent to any material issue. Specifically, the allegations that Robb was "lucky" enough to be "born into extreme wealth," and that he was "home-schooled and had not distinguished himself in any way," do not bear on any issue in the case. On the contrary, these statements appear to be an attempt to gin up resentment against Robb on the part of a potential jury, or, more generally, to embarrass him. Whether any of these allegations is "true" or not, they have no relevance to this particular case, and are therefore stricken.

Paragraph 2 also contains "allegations" that are "amorphous, unspecific and cannot be defended against." *G-I Holdings, Inc.*, 238 F. Supp. 2d at 556. Specifically, the statements that "no expression better describes" Robb's actions than "What's mine is mine, and what's yours is

mine," and that Robb is "not the type of person who gives back, shares or pays forward" are broad, *ad hominem* character attacks that do not assert any facts that can be litigated in this case. Low argues that these statements are "simply Low's own characterization of Defendant's actions." (Pl. Opp. at 6.) That may be the case, but that does not mean the statements are immune to Rule 12(f). Even if Robb is ultimately found liable on every claim in the case, we will be no closer to knowing whether Robb is "the type of person who gives back, shares or pays forward," nor will it matter.

Accordingly, the following paragraphs or portions of paragraphs are also stricken: Paragraph 2, in full; Paragraph 16, second sentence.

Paragraph 17 contains background information, and Robb has not shown how inclusion of these statements could prejudice him in any way. Robb also moves to strike Paragraph 59, but does not address why that particular paragraph should be stricken in any of his motion papers. A motion to strike will not be granted unless the movant "state[s] with particularity the grounds for [his] motion." *Arias-Zeballos v. Tan*, No. 06 Civ. 1268, 2006 WL 3075528, at *9 (S.D.N.Y. Oct. 26, 2006). Given the general reluctance to grant motions to strike, the Court will not strike allegations without being provided with specific reasons why doing so is necessary.

## III.    Conclusion

For the foregoing reasons, Defendant's motion to dismiss the claim for fraud is GRANTED. Defendant's motion to strike particular portions of the Complaint is GRANTED IN PART and DENIED IN PART. Specifically, the following sections of the Complaint are hereby stricken: Paragraph 2, in full; Paragraph 7, only the second sentence; Paragraph 16, only the second sentence; Paragraph 18, in full; Paragraph 46, only the clause, "Like Robb Jr.'s brothers and sisters."

Plaintiff shall file and serve an amended complaint, without the stricken portions, on or before February 6, 2012.

SO ORDERED.

Dated: New York, New York
       January 20, 2012

_____
J. PAUL OETKEN
United States District Judge